**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **AIG EUROPE LTD.** | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **C. A. NO. 1:17-CV-319** |
| | § | |
| **CATERPILLAR INC. AND** | § | |
| **DRAGON PRODUCTS, LLC** | § | |
| **Defendants.** | § | |

---

## DEFENDANT DRAGON PRODUCTS, LLC'S

## MOTION FOR SUMMARY JUDGMENT

---

DAVID A. OUBRE
David.Oubre@lewisbrisbois.com
Federal I.D. No. 23909
State Bar No. 00784704
DAVID C. DEISS
David.Deiss@lewisbrisbois.com
Federal I.D. No. 33627
State Bar No. 24036460

LEWIS BRISBOIS BISGAARD & SMITH, LLP
24 Greenway Plaza, Suite 1400
Houston, Texas  77046
(713) 659-6767 Telephone
(713) 759-6830  Facsimile

**ATTORNEYS FOR DEFENDANT
DRAGON PRODUCTS, LLC**

# TABLE OF CONTENTS

APPENDIX ................................................................................................................4

TABLE OF AUTHORITIES ................................................................................... 6

    Summary of Argument .................................................................................8

    Factual Background ....................................................................................10

    Statement of Issues ....................................................................................11

    Summary Judgment Standard .....................................................................12

    Applicable Substantive Law .......................................................................12

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................13

A.    Baker Hughes' Movement of the Unit Prior to the Fire ...............................14

B.    The Fire ....................................................................................................14

C.    Origin of Engine and Unit...........................................................................15

D.    Baker Hughes' Testing of the Unit and Engine Before Acceptance ...............16

E.    Additional Testing and Use of the Engine by Baker Hughes .........................17

I.    ARGUMENT & AUTHORITIES ................................................................18

A.    Summary judgment standard .......................................................................18

B.    Chapter 82 of the Texas Civil Practices & Remedies Code Precludes Liability of Dragon as a Nonmanufacturing Seller .................................................................18

C.    AIG Must Prove the Engine Was Defective to Maintain a Negligence or Implied Warranty Claim...........................................................................................20

D.    AIG Cannot Show a Product Defect...........................................................22

E.    AIG Cannot Establish Causation .................................................................24

F.    AIG Has Not Established Proper Use to Support an Implied Warranty Claim ................26

G.    Dragon Neither Provided nor Breached an Express Warranty .........................27

H.      There is No Evidence Dragon was Negligent........................................................28

I.      There is No Evidence Dragon Breached a Contract or Quasi-Contract ...........................29

PRAYER...........................................................................................................................30

## APPENDIX

**Exhibit A:**    **Deposition of Baker Hughes' Mark Moreno**

**Exhibit B:**    **Deposition of Baker Hughes' Victor Martinez**

**Exhibit C:**    **Deposition of Baker Hughes' Martin Mejias**

**Exhibit D:**    **November 1, 2018 Expert Report of John Timmons**

**Exhibit E:**    **Caterpillar Responses and Answers to Plaintiff's Requests for Admission and Interrogatories (excerpt)**

**Exhibit F:**    **Caterpillar Engine Manual (excerpt)**

**Exhibit G:**    **Sales Documents(3512C Engine-Serial#WF500396) - Caterpillar to Mustang**

**Exhibit H:**    **Baker Hughes Specification Procedure Form**

**Exhibit I:**    **Baker Hughes' Victor Martinez Witness Statement**

**Exhibit J:**    **Exhibit 2 to Mark Moreno Deposition – Layout of the St. Lucia Site at time of the Fire.**

**Exhibit K:**    **Dragon's Purchase Order from Applied Cryo and Mustang**

**Exhibit L:**    **Baker Hughes Procedure, Start-Up and Test Specifications**

**Exhibit M:**    **Purchase Order and Bill of Lading demonstrating Purchase by Baker Hughes.**

**Exhibit N:**    **Dragon's Invoice to Baker Hughes for Purchase of the Unit.**

**Exhibit O:**    **Exhibit 18 to Depo of Martin Mejias – Asset Meter Readings for the Unit.**

**Exhibit P:**    **Sales Documents (3512C Engine-Serial#WF500396) - Mustang to Applied Cryo**

**Exhibit Q:**    **Deposition of Dragon's Tom Inman**

**Exhibit R:**    **Deposition of Dragon's Gary Markham**

**Exhibit S:**    **Deposition of Baker Hughes' Stan Bradford**

**Exhibit T:**    **October 31, 2018 Report of Gregory J. Haussmann**

**Exhibit U:**    **November 1, 2018 Report of Scott Davis**

**Exhibit V:**    **Exhibit 12 to Depo of Victor Martinez – Demonstration of Where Fire Began in Comparison to Where Connecting Rod Failed.**

**Exhibit W:**    **Exhibit 17 to Depo of Martin Mejias – Baker Hughes's Work Orders for the Unit.**

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) ........................................................ 12

*Bensono v. Indymac Mortg. Services*, 02-13-00197-CV, 2014 WL 787851 (Tex. App.—Fort Worth Feb. 27, 2014, no pet.) ......................................................................................... 29

*Caldwell v. Curioni*, 125 S.W.3d 784 (Tex. App.—Dallas 2004, pet. denied) .......................... 28

*Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp. 2d 623 (S.D. Tex. 2007)......................... 30

*City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313 (Tex. App.—Austin 1992, no writ).......................................................................................................................... 29

*Cooper Tire & Rubber Co. v. Mendez*, 204 S.W. 3d 807 (Tex. 2006) ................................... 22, 25

*D. Houston, Inc. v. Love*, 92 S.W.3d 450 (Tex. 2002).................................................................. 28

*Duffy v. Leading Edge Prods.*, 44 F.3d 308 (5th Cir. 1995)........................................................ 12

*Ferrous Prod. Co. v. Gulf States Trading Co.*, 332 S.W.2d 310 (1960) ...................................... 29

*Fields v. Klatt Hardware & Lumber, Inc.*, 374 S.W.3d 543 (Tex. App.-San Antonio 2012, no pet.) .................................................................................................................................. 18

*Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir. 1986)............................................................... 12

*Ford Motor Co. v. Ridgway*, 135 S.W.3d 598 (Tex. 2004) .............................................. 22, 23, 24

*Fordoche Inc. v. Texaco, Inc.*, 463 F.3d 388 (5th Cir. 2006) ...................................................... 12

*Garcia v. LG Electronics USA Inc.*, 2011 WL 2517141 (S.D. Tex. June 23, 2011) ................... 19

*Gonzalez v. Estes, Inc.*, 2010 WL 610778, at *4 (W.D. Tex. Feb. 19, 2010).............................. 19

*Great Am. Products v. Permabond Intern., a Div. of Nat'l Starch & Chem. Co.*, 94 S.W.3d 675 (Tex. App.—Austin 2002, pet. denied)...................................................................... 27

*Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 666 (Tex. 1999) .............................. 20, 21, 22

*Mack Trucks*, 206 S.W.3d at 583 ........................................................................................... 24, 25

*MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132 (Tex. 2014) ............................... 23

*McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 27 (Tex. App.–San Antonio 2004, no pet.) ............................................................................................ 29

*Mid Continent Aircraft Corp. v. Curry Cty. Spraying Serv., Inc.*, 572 S.W.2d 308 (Tex. 1978) . 19

*Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004) ........................ 23, 24, 25

*Omni USA, Inc.*, 964 F. Supp. 2d 805 (S.D. Tex. 2013 ........................................................ *passim*

*Otis Spunkmeyer, Inc.*, 30 S.W.3d at 690 ................................................................................ 20

*Plas–Tex*, 772 S.W.2d at 444 .................................................................................................. 26

*Plotkin v. Joekel*, 304 S.W.3d 455 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ....... 29, 30

*Richter v. Wagner Oil Co.*, 90 S.W.3d 890 (Tex. App.–San Antonio 2002, no pet.).................. 29

*Shaun T. Mian Corp.*, 237 S.W.3d at 857 ...................................................................... 20, 21, 22

*Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306 (Tex. 2009) ................................................ 22, 23, 24

*Van Horn v. Chambers*, 970 S.W.2d 542 (Tex. 1998)................................................................ 28

## Statutes

Tex. Civ. Prac. & Rem. Code §82.001(2).................................................................................. 18, 19

Tex. Civ. Prac. & Rem. Code § 82.003(a)(1)-(7) ................................................................. 10, 19

Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ § 82.005(a) .......................................................................... 22

Fed. R. Civ. P. 56............................................................................................................................ 18

Fed. R. Civ. P. 56(c)(2)................................................................................................................... 12

Defendant Dragon Products, LLC ("Dragon") files this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, seeking summary judgment as to all claims made by Plaintiff, AIG Europe, Ltd. ("AIG Europe" or "AIG"), against Dragon Products.  In support of this motion, Dragon respectfully shows as follows:

### Summary of Argument

1.      This is a property damage case resulting from a fire at a well site.  Plaintiff AIG Europe LTD's claims in this case are premised solely upon the alleged failure of a Caterpillar 3512C engine.[1]  The 3512C engine was designed and manufactured by Defendant Caterpillar Inc. ("CAT").  The CAT 3512C engine was sold by third-party Mustang Power Systems to third-party, Applied Cryo Technologies, who assembled the engine onto a flatbed trailer provided by Dragon Products.  Dragon Products did not design, manufacture, assemble, or alter the CAT 3512C engine.  Dragon Products simply assembled (according to Baker Hughes specification) and sold a complete Fracturing Unit ("Unit"), which contained the CAT 3512C engine, to Baker Hughes.  Beyond the fact that it has not shown any defect in the CAT 3512C engine, Plaintiff AIG Europe does not contend nor has it adduced any evidence that the fire resulted from anything other than the CAT 3512C engine.

2.      Baker Hughes designed the Fracturing Unit to its own in-house specifications.  Baker Hughes specifically required the CAT 3512C engine for use in the Fracturing Unit it designed to its own specifications.  Baker Hughes "live" tested and frequently inspected the Fracturing Unit with the CAT 3512C engine prior to accepting delivery of the unit.[2]  Baker Hughes tested the Fracturing

---

[1] Plaintiff contends this particular 3512C engine had something to do with a fire at the St. Lucia Well Site on July 12, 2016 in Loving County, Texas, where Baker Hughes was performing hydraulic fracturing.

[2] Baker Hughes purchased multiples of these CAT 3512C Units from Dragon Products and continue to do so to this day.

Unit again prior to placing it into field use and used the Fracturing Unit with the CAT 3512C on one (and likely more) hydraulic fracturing jobs prior to the job where the fire occurred.  At the time of the fire made the basis of Plaintiff's suit, the CAT 3512C engine had been in operation for at least 880 hours.  Baker Hughes was also responsible for maintaining the Unit, including monitoring its use and wear and making timely oil and filter changes.  Baker Hughes also altered the Fracturing Unit by installing its own proprietary designed and manufactured "Controls", which monitor the unit's diagnostics and performance.  The Controls are considered the "heartbeat" of the Fracturing Unit.

      3.     Plaintiff AIG Europe has neither plead facts or adduced proof to support what, if anything, it contends Dragon Products did in relation to the alleged defective CAT 3512 C engine.  Nevertheless, Plaintiff AIG Europe has asserted claims of: negligence (Count 1); defect in design (Count 2); defect in manufacture (Count 3); and breach of contract, quasi-contract, and/or warranty (Count 4) against both Caterpillar Inc. and Dragon Products, LLC.  The crux of Plaintiff's allegation in this case is that the CAT 3512C engine "threw a rod" which caused the fire and resulting property damage.  However, Plaintiff has failed to raise admissible evidence or expert testimony to support this allegation.  Moreover, even if assumed true, the allegation does not implicate any liability of Dragon Products.  Dragon Products did not design, manufacture, or alter the CAT 3512C engine.

      4.     Plaintiff does not allege that the asserted defect came from anything other than the CAT 3512C engine.  Plaintiff does not allege or provide evidence that any negligent act of Dragon Products resulted in the CAT 3512C engine becoming defective or that any other act of Dragon Products otherwise caused the fire or property damage (Count 1).  The Fracturing Unit sold to Baker Hughes had been in Baker Hughes' possession and control for over 1.5 years at the time of the fire. It had presumably been in active operation in the field for Baker Hughes during that time as it had at

least 880 logged engine hours and an oil change at approximately 800 hours.  Plaintiff provides no evidence that Dragon designed or manufactured the CAT 3512C engine and has not plead or raised evidence that any defect in a design or manufacture of any other portion of the Fracturing Unit otherwise caused the fire or property damage (Count 2 and Count 3).  There has been no evidence, pleading, or discovery implicating the design or build of the Fracturing Unit (other than the engine) as faulty or negligent itself.  Plaintiff has neither plead nor adduced evidence of any fact that Dragon Products breached a contract or warranty with Baker Hughes. (Count 4).  Baker Hughes testified that it fully specified the design and components of the Fracturing Unit, worked with Dragon Products throughout the assembly of the Fracturing Unit, tested it extensively, and that Dragon Products delivered what was ordered.

5.      Plaintiff's lawsuit is simply about an engine that it theorized as causing a fire.  Its experts ultimately could not support that theory and even if they had, the theory does not implicate liability against Dragon Products.  Under Chapter 82 of the Texas Civil Practices and Remedies Code, Dragon Products cannot be held liable for any of Plaintiff's asserted claims as Dragon is a non-manufacturing seller.  Tex. Civ. Prac. & Rem. Code § 82.003.  Accordingly, even if the allegations in Plaintiff's complaint are assumed true, its claims against Dragon Products must be dismissed.  Above and beyond that, Dragon Products demonstrates in this motion that there is no genuine issue as to any material fact and judgment as a matter of law should be entered on Plaintiff's claims against Dragon Products.

**Factual Background**

6.      AIG Europe filed this suit against Defendants Caterpillar and Dragon Products in Texas State Court asserting common law claims for negligence, products liability, breach of contract/quasi-contract, and breach of express and implied warranties. Caterpillar subsequently

removed this case to this Court based on diversity of citizenship jurisdiction. Dragon and Caterpillar have both filed Original Answers in this case. The parties have conducted extensive written discovery and taken the depositions of a experts, corporate representative, and several fact witnesses. Along with this Motion for Summary Judgment, Dragon has filed a Motion to Strike and Motion to Exclude all Experts Designated by AIG Europe in this case.

7.     AIG Europe's claims against Caterpillar and Dragon arise out of a fire that occurred at the St. Lucia Well Site on July 12, 2016 in Loving County, Texas. At the time of the fire, AIG's insured, Baker Hughes Incorporated ("Baker Hughes"), was performing hydraulic fracturing at the site on behalf of XTO Energy. AIG Europe asserts that during the course of the fracing operation, a mobile frac pumping unit PPF11441 (the "Unit"), marked as Unit #3, caught fire because of defects in the Caterpillar 3512C Engine, Serial Number: WF500396 (the "Engine") located on the Unit. AIG Europe asserts that it sustained substantial property damage to equipment other than the Engine or Unit as a result of the fire. In its pleadings, AIG Europe asserts the Engine was designed and manufactured by Caterpillar, and that the Unit itself was sold by Dragon Products to Baker Hughes.

8.     Despite the allegations, AIG Europe has failed to produce any evidence in support of its claims against Dragon Products, and therefore Dragon Products is entitled to summary judgment with respect to all of the claims asserted by AIG Europe.

### Statement of Issues

9.     Dragon is entitled to summary judgment as to all of AIG's claims against it for the following reasons:

A.     Chapter 82 of the Texas Civil Practices & Remedies Code precludes liability of Dragon as a nonmanufacturing seller as to all of Plaintiff's products liability claims.

B.     AIG must prove the engine was defective to maintain a negligence or implied Warranty Claim.

11

C.      AIG cannot show a product defect.

D.      AIG cannot establish causation.

E.      AIG has not established proper use to support an implied warranty claim.

F.      Dragon neither provided nor breached an express warranty.

G.      There is no evidence Dragon was negligent.

H.      There is no evidence Dragon breached a contract or quasi-contract.

## Summary Judgment Standard

10.      Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The substantive law determines which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A movant who bears the burden of proof at trial must establish "beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). By contrast, a party seeking summary judgment who does not have the burden of proof at trial need only point to the absence of a genuine fact issue. *See Duffy v. Leading Edge Prods.*, 44 F.3d 308, 312 (5th Cir. 1995). Once the movant meets its initial burden, the burden shifts to the nonmoving party to produce evidence or designate specific facts in the record showing the existence of a genuine issue for trial. *See Fordoche Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

## Applicable Substantive Law

11.      Because subject matter jurisdiction in this case is founded on diversity, the case is controlled by Texas' substantive law. *See Fontenot*, 780 F.2d at 1194.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

12.     In July 2016, Baker Hughes undertook to perform frac pumping operations (aka "hydraulic fracturing")[3] at the St. Lucia Well Site located in Loving County, Texas, about 75 miles from Midland/Odessa. *See* Ex. B at 15, 27, 29.

13.     According to allegations made by AIG, AIG provided insurance coverage to Baker Hughes, and is therefore subrogated to the rights of Baker Hughes pursuant to an insurance policy. *See* AIG Orig. Complaint [Doc. 2] at 2.

14.     Prior to beginning its frac pumping operations at the St. Lucia well site, the owner of the site, XTO Energy, provided Baker Hughes with information about the type of job to be performed and then Baker Hughes made a determination as to how to equip and set up the site. *See* Ex. B at 25:1-29:6.

15.     To accomplish the operation at the St. Lucia Well Site, Baker Hughes placed numerous pieces of equipment at the site, including several "pumping units" that were used to pump the liquid into the well. *See* Ex. B at 29:15-29:25; Ex. A at 23:14-23:19 (indicating that Ex. 2 to Depo of Moreno is the way the well site was set up on the day of the fire); *see also* Ex. J (depicting the equipment set up at the St. Lucia well site).

16.     According to the testimony of Mark Moreno, a Baker Hughes employee that worked at the St. Lucia site, pumping units at a well site are supposed to be spaced three to four feet apart, yet the pumping units at the St. Lucia site were only spaced two to three feet apart from each other. *See* Ex. A at 79:1-80:7.

---

[3] Hydraulic fracturing entails the pumping of liquids into a well to break up a formation so that hydrocarbons are released and can be extracted. *See* Ex. A at 30-31; Ex. B at 29.

17.    Frac pumping operations are performed in stages, and the operation at the St. Lucia site called for Baker Hughes to perform 34 stages of pumping. *See* Ex. B at 35:11-35:16.  Operations at the St. Lucia site began on July 5, 2016, and by the morning of July 12, 2016, Baker Hughes was on stage 24 of the 34-stage operation. *See* Ex. A at 33:16-33:22.

**A.    Baker Hughes's Movement of the Unit Prior to the Fire**

18.    Between Stage 23 and Stage 24, the pumping unit located in the number 3 position had to be changed, and therefore Baker Hughes removed that unit and replaced it with unit PPF11441 (the "Unit"), which contained a Caterpillar 3512C Engine, Serial Number: WF500396 (the "Engine"), that had been in the number 4 position. *See* Ex. B at 48:10-52:13.  Thus, for Stage 24, the Unit was in the number three position.  *See id.* at 49:14-49:20.  The movement of the Unit into the number three location was a complicated procedure that required employees of Baker Hughes to remove numerous hoses and lines and then reattach those hoses and lines before starting the Unit. *See id.* at 50:6-50:18; 51:14-52:13 (stating "it probably took a good hour" to reconfigure the units and "a lot of things needed to be disconnected and reconnected in order to complete" the process of moving the unit).

**B.    The Fire**

19.    After moving the Unit, Baker Hughes began Stage 24 at around 4 p.m. on July 12, when Victor Martinez noticed a fire. Ex. B.at 58:2-59:11.   No Baker Hughes employees have reported seeing the fire begin, but Mr. Martinez tried to put out the fire after seeing smoke and hearing the call that a fire had started. *Id.*  In a statement recorded soon after the fire, and during a deposition taken on September 5, 2018, Martinez reported that he saw flames on the Unit near the radiator. *See* Ex. I.; *see also* Ex. B at 71:15-72:23; Ex. W (Black arrow indicating where Mr. Martinez was standing and Red Arrow indicates where he saw flames on the Unit). According to

Martinez, the fire eventually spread from the Unit to other pumping units located at the site. See Ex. I.

## C.    Origin of Engine and Unit

20.     The Engine was designed, manufactured, and assembled by Caterpillar and then sold to one of Caterpillar's authorized dealers, Mustang Powers Systems ("Mustang"). *See* Ex. E, Admissions 1-3 at pp. 4-6; Ex. G.  The Engine was then purchased by Applied Cryo Technologies ("ACT"), who assembled the Engine onto a trailer and sold it to Dragon. *See* Ex. P; Ex. Q at 36:7-37:1; Ex. R at 59:8-59:10.

21.     Baker Hughes purchased the Unit from Dragon in September 2014. Ex. M; Ex. N. Prior to purchasing the Unit, Baker Hughes provided Dragon with specifications for the different types of parts that it wanted the Unit to include.  Ex. L; Ex. SS at 17:17-17:25; 18:16-18:23; 19:19-20:20; 22:4:22:20.  Baker Hughes ostensibly designed the Unit and had the ultimate say as to its components and configuration. Ex. SS at 22:4-22:20; 23:11-23:17.  Ultimately, Dragon assembled the Unit in fulfillment of the specifications and requirements of Baker Hughes.  *Id*. at 91:17-91:25; Ex. L; Ex. R at 52:12-52:17.  Importantly, Baker Hughes specifically required Dragon to include the model 3512C Caterpillar Engine that AIG now alleges is defective. Ex. S at 18:16-18:23; 26:29-26:13; 90:20-91:5; *see also*, Ex. R at 52:12-52:17.

22.     Dragon does not recommend one engine over another to customers.  Ex. R at 70:21-70:24.  Dragon did not design, manufacture, assemble, or modify the Engine.  *See* Ex. E, Admissions 1-3 at pp. 4-6.  Dragon simply packaged the remainder of the Unit as specified by Baker Hughes and assembled those parts in accordance with Baker Hughes's specifications following ACT's

installation of the Engine and transmission.[4] Ex. S at 17:17-17:25; 18:16-18:23; 19:19-20:20; 22:4:22:20; Ex. R at 24:9-24:14; 24:23-24:25; 25:20-26:6; 40:8:40:11; 40:17-40:22; 42:7-42:20; 59:8-59:10.

**D.      Baker Hughes' Testing of the Unit and Engine Before Acceptance**

23.      Before Baker Hughes took possession of the Unit from Dragon, Baker Hughes conducted extensive testing of the Unit using testing protocols and parameters specified by Baker Hughes. Ex. H; Ex. S at 23:6-23:17; 73:10-74:23; 77:5-79:13; 82:2-82:17; *see also*, Ex. R at 24:9-24:14; 24:23-24:25; 25:20-26:6, 40:8:40:11; 40:17-40:22; 42:7-42:20.   Prior to taking delivery, Baker Hughes also modified the Unit by installing Baker Hughes' own proprietary designed and manufactured set of controls[5].   Ex. S at 39:4-39:6; 39:19-40:19; 86:7-86:17; *see also*, Ex. R at 23:16-23:25; 54:2-54:6; 54:18-54:23; 74:24-75:1.   The testing that Baker Hughes performed on the Unit was done in accordance with protocols designed by Baker Hughes and a Baker Hughes representative is present during this testing.   *Id*.   A Baker Hughes employee certified that the Unit, including the Engine, met or exceeded Baker Hughes' performance expectations.   Ex. H; Ex. S at 23:6-23:17; 73:10-74:23; 77:5-79:13; 82:2-82:17; Ex. R at 24-26, 42.   Because the Unit and its Engine met the specification and performance expectations of Baker Hughes after thorough inspection and testing by Baker Hughes, Baker Hughes accepted and took possession of the Unit from Dragon on December 31, 2014.   Ex. M; Ex. S at 23:6-23:17; 73:10-74:23; 77:5-79:13; 82:2-82:17; Ex. H; Ex. R at 24-26, 72. Baker Hughes purchased the Unit and Engine in new condition. Ex. Q at 86:17-86:20.

---

[4] "Packaging" is essentially an assembly of various parts pursuant to the customer's specifications.  Ex. R at p. 8:12-8:13.

[5] Controls are the "heartbeat" of the frac unit and without them, the unit does not operate. Ex. S at 40:23-41:14. The controls start, stop, throttle and shift the frac unit as well as monitor operating temperatures, oil pressure, pump, and lube pressure.  *Id*. at 39:3-39:18.  They integrate the engine transmission and the pump and enable the operation of the completed package.  Ex. R at 54:21-54:23.

**E.     Additional Testing and Use of the Engine by Baker Hughes**

24.     Baker Hughes tested the Engine and Unit again prior to placing it into operation.  Ex. B 91:18-92:7.[6] Baker Hughes was in possession of the Unit for 1.5 years at the time of the incident. Ex. M.  Asset Meter Readings produced by Baker Hughes demonstrate that the Unit had at least 880 hours when the incident occurred. Ex. S at 93:2-93:4; Ex. O. Data compiled from Caterpillar's Service Information Management System (SIMS) demonstrates that the Unit had over 1911 hours of operation at the time of the incident.  *See* Ex. D at unnumbered pages 20-22.  This system shows database entries from Caterpillar dealer personnel that document repair work done to the Engine. *Id.* Caterpillar's SIMS data shows that the Engine was built in August 2014 and put into service in December 2014. *Id.* By late October 2015, the Engine had accumulated 1473 hours of operation, and by March 3, 2016, the Engine had accumulated 1911 hours of operation. *Id.*

25.     AIG has produced minimal evidence demonstrating how the Unit was used after it was purchased from Dragon, and AIG has produced no evidence demonstrating that the Unit was operated properly or in the manner in which it was intended to be used. Despite the limited evidence produced by AIG regarding the use of the Unit, at a minimum, Baker Hughes used the Unit to drill 23 stages of the St. Lucia well. Ex. B at 35:11-35:19; 42:9-42:23; 48:2-49:20. Each stage took several hours of pumping, and Baker Hughes employees have testified that the pumping units were run for 16 – 18 hours a day at the St. Lucia well site. *Id*. at 100:19-101:2.  In addition, the data from Caterpillar's SIMS indicates that Baker Hughes had utilized the Unit and Engine prior to the St. Lucia job because the Engine had 1911 hours of operation in March 2016.  Ex. D at unnumbered pages 20-22.  The St. Lucia job did not begin until July 5, 2016. Ex. B at 35:24-36:1.

---

[6] There is no allegation or evidence adduced in this case that Dragon performed any maintenance or modifications to the Unit following Baker Hughes' purchase and acceptance.  Dragon would not perform any maintenance or repair upon a Caterpillar engine.  Ex. R at 62:23-63:3.

26.     Despite being run for 16 -18 hours a day for almost a week, Baker Hughes employees who were at the site at the time of the incident testified that they had experienced no problems with the Unit prior to the drilling of Stage 24. Ex. A at 144:19-144:23. Thus, no evidence exists demonstrating a problem with the Unit until after Baker Hughes employees performed the complicated procedure of moving the Unit, by unhooking numerous hoses and cables and reattaching those hoses and cables, prior to the start of Stage 24. *See* Ex. B at 50:6-50:18; 51:14-52:13; Ex. A at 119:14-123:13; 144:19-23.

## I.     Argument & Authorities

### A.     Summary judgment standard

27.     Under Rule 56 of the Federal Rules of Civil Procedure, Dragon is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  As discussed in more detail below, Dragon can meet that burden on every single one of Plaintiff AIG Europe's causes of action.

### B.     Chapter 82 of the Texas Civil Practices & Remedies Code Precludes Liability of Dragon as a Nonmanufacturing Seller

28.     AIG seeks compensation for damages to property owned by its subrogee, Baker Hughes [Document 2].  Each of Plaintiff's asserted claims in this case are considered products liability claims under Texas law.  Chapter 82 of the Texas Civil Practice and Remedies Code addresses products liability.  *Fields v. Klatt Hardware & Lumber, Inc.*, 374 S.W.3d 543, 546 (Tex. App.-San Antonio 2012, no pet.).   The term "products liability action" is statutorily defined as:

> any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories.

*See* Tex. Civ. Prac. & Rem. Code §82.001(2) (emphasis added).

29.     Texas law "provides blanket protection for nonmanufacturing sellers of products from liability for injuries caused by a defective product unless one of the specified exceptions appl[ies]." *Garcia v. LG Electronics USA Inc.*, 2011 WL 2517141, at *2 (S.D. Tex. June 23, 2011); *see* Tex. Civ. Prac. & Rem. Code § 82.003(a)(1)-(7).  Plaintiff has not alleged that anything other than the Engine was defective. [Document 2].  It is undisputed that Dragon did not design or manufacture the Engine that Plaintiff contends was defective.  Plaintiff makes no defect allegations regarding the Unit other than the Engine.  Dragon assembled the Unit in accordance with Baker Hughes requirements and components, including the Engine.  Dragon did not design or manufacture the Unit and Plaintiff makes no allegations that Dragon designed or manufactured any product that Plaintiff contends was defective.

30.     The plaintiff has the burden of pleading and proving that one of the exceptions to Chapter 82 applies. *See id.* § 82.003(a) ("A seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves [one of the seven exceptions.]"); *Gonzalez v. Estes, Inc.*, 2010 WL 610778, at *4 (W.D. Tex. Feb. 19, 2010).  Here, Plaintiff has failed to plead or prove that any exception removes Dragon from the protection of Chapter 82.

31.     Plaintiff's negligence and breach of implied warranty claims against Dragon are encompassed within the statutory definition of a products liability action because Plaintiff seeks a recovery of damages "arising out of personal injury, death, or property damage." *See* Tex. Civ. Prac. & Rem. Code § 82.001(2).  Plaintiff seeks to recover damages for harm to property and equipment other than the Engine or Unit.  Therefore, Chapter 82 applies to Plaintiff's claims against Dragon and provides Dragon immunity from negligence and breach of implied warranty claims.  *See Mid Continent Aircraft Corp. v. Curry Cty. Spraying Serv., Inc.*, 572 S.W.2d 308, 313 (Tex. 1978) (An

implied warranty claim is a contractual claim only if the injury is limited to the defective product itself).

### C.     AIG Must Prove the Engine Was Defective to Maintain a Negligence or Implied Warranty Claim

32.     Even if Chapter 82 would not provide immunity from all claims Plaintiff asserts against Dragon, AIG must still prove an Engine defect to maintain an implied warranty or negligence claim.  Whether a defect exists for purposes of products liability often resolves whether a product was defective and, therefore, breached an implied warranty of merchantability or constituted negligence. *See Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 666 (Tex. 1999); *see also Shaun T. Mian Corp.*, 237 S.W.3d at 857; *Otis Spunkmeyer, Inc.*, 30 S.W.3d at 690.

33.     In *Hyundai Motor Co. v. Rodriguez*, the Texas Supreme Court concluded that, under certain factual scenarios, the "defect" at issue in a claim for strict liability and a claim for breach of implied warranty may be functionally identical. 995 S.W.2d at 666. In *Hyundai*, the defect in question was the crashworthiness of a car. *Id*. The plaintiff argued she sustained personal injuries that were more serious than she would have otherwise sustained because the car was defectively designed. *See id.* at 662. The supreme court said the circumstances of that case illustrated that the two concepts of "defect" for strict-liability and breach of implied warranty claims can involve identical fact determinations. There, both of the plaintiff's claims arose from a single complaint— that design defects in the roof and restraint systems prevented the car from affording adequate protection in a vehicle rollover. *See id.* at 665. The plaintiff did not plead or attempt to prove that some defects related only to her strict liability claim and some only to her breach of implied warranty claim. *See id.* The court also noted the plaintiff did not offer any evidence to prove a breach of implied warranty that did not also support her claim of strict liability. *See id.* Under those circumstances, the court observed that a vehicle "cannot be unfit for ordinary use but not

unreasonably dangerous, nor can it be unreasonably dangerous but fit for ordinary use; it must be both or neither." *See id.*

34.     Similar to the Court's holding in *Hyundai*, in *Shaun T. Mian Corp.*, the plaintiff alleged no negligence other than conduct relating to whether a printer was defective when sold. 237 S.W.3d at 857.  In that case, a printer fire caused damage to surrounding property. *Id.*  Because the plaintiff alleged no negligent conduct other than whether the printer was defective, the court held that the plaintiff's negligence theories were encompassed and subsumed in their defective product theories, and therefore plaintiff's burden at trial would be to prove injury resulting from a product defect. *See id.*

35.     In this case, AIG pleads that Dragon negligently selected and supplied "the Engine which was inadequate, insufficient, and/or unsuitable because it 'threw' a connecting rod during normal operation." [Document 2] at ¶23.  In support of its product liability claims, AIG asserts "the design of the Engine was defective and inadequate because it 'threw' a connecting rod during normal operation" and "the manufacture of the Engine was defective in that the Engine was inadequate because it 'threw' a connecting rod during normal operation, thus, the Engine was also unstable." [Document 2] at ¶¶32,42.  With respect to its implied warranty claim, AIG asserts the "Engine" was not of merchantable quality . . . because it 'threw' a connecting rod during normal operation." [Document 2] at ¶49.  Ultimately, it is clear based on AIG's pleadings that like the plaintiff's in *Shaun T. Mian* and *Hyundai*, AIG's claims against Dragon arise from a single complaint or allegation—that the Engine at issue was defective because it threw a connecting rod during normal operation. *See Shaun T. Mian Corp.*, 237 S.W.3d at 857; *Hyundai Motor*, 995 S.W.2d at 666. AIG has not pleaded or attempted to prove that some defects relate to its strict liability claim and others to its breach of implied warranty and negligence claims.  All the claims are same.  AIG has not even

offered any evidence to prove negligence or a breach of implied warranty that is separate from the evidence that allegedly supports its strict liability claims.

36.     Accordingly, AIG's negligence and implied warranty claims against Dragon are subsumed into its products liability claims.  AIG's right to recover against Dragon on its alternative theories "stand[s] or fall[s] on the outcome of its products liability claims." *Shaun T. Mian Corp.*, 237 S.W.3d at 857; *see also Hyundai Motor*, 995 S.W.2d at 666; *Otis Spunkmeyer, Inc.*, 30 S.W.3d at 690.  AIG has not alleged a defect for which Dragon can be held liable and as alleged below, AIG cannot even show a defect to the Engine.

**D.     AIG Cannot Show a Product Defect.**

37.     As a threshold matter, Plaintiff has adduced no evidence that Dragon designed the Engine and that fact has not been disputed by Plaintiff.  To prove its defective design claim against Dragon, AIG must establish (as to Dragon) that: "(1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the damage for which the plaintiff seeks recovery." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009); TEX. CIV. PRAC. & REM. CODE § 82.005(a).  Plaintiff has adduced no evidence for any of these elements.  Most glaring, Plaintiff has adduced no evidence of a safer alternative design.  *See Cooper Tire & Rubber Co. v. Mendez*, 204 S.W. 3d 807-08 (Tex. 2006).

38.     Plaintiff has adduced no evidence that Dragon manufactured the Engine and that fact has not been disputed by Plaintiff.  "A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). "A plaintiff must prove that the product was defective when it left the hands of the manufacturer and that the defect was the producing cause of the plaintiff's injuries." *Id.*  Plaintiff has adduced no

22

evidence for any of these elements.  Plaintiff has wholly failed to adduce evidence of a defect when the Engine left the hands of Caterpillar.[7]  *Omni*, 964 F. Supp. 2d at 817; *see also MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 139 (Tex. 2014) (quoting *Plas-Tex, Inc.*, 772 S.W.2d at 444).

39.     The Texas Supreme Court has held in products liability actions that "a specific defect must be identified by competent evidence . . . ." *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004).  AIG, however, has failed to identify a specific defect by competent evidence. AIG has alleged that the Engine was defective because it threw a rod, but it has no evidence to show, what, if any, defect caused the Engine to throw a rod. Ultimately, because no expert has opined that the Engine or Unit was defective, the only evidence that AIG has to support its defective product theories is the failure of the Engine itself. Under Texas law, proof of product failure or malfunction, standing alone, generally does not constitute sufficient proof of a product defect. *Nissan Motor*, 145 S.W.3d at 137.

40.     A plaintiff must produce competent evidence of specific defect in the design of a product or evidence that the product deviated from the manufacturer's specifications or planned output, that such defects existed at the time the product left the manufacturer's hands, and that such defects rendered the product unreasonably dangerous. *See Timpte Industries*, 286 S.W.3d at 311; *see also Ford Motor Co.*, 135 S.W.3d at 600-02.  Because none of AIG's experts have opined that the Unit or Engine were defective, and no expert has opined that the Unit or Engine were unreasonably dangerous, AIG has no competent evidence establishing a product defect. *See Timpte Industries*, 286 S.W.3d at 311; *see also Ford Motor Co.*, 135 S.W.3d at 600. Accordingly, AIG's product claims

---

[7] Baker Hughes extensively tested the Unit before and after taking delivery and found no defects. Ex. H; Ex. S at 23:6-23:17; 73:10-74:23; 77:5-79:13; 82:2-82:17; *see also*, Ex. R at 24:9-24:14; 24:23-24:25; 25:20-26:6, 40:8:40:11; 40:17-40:22; 42:7-42:20.

against Dragon must fail, and this Court should render summary judgment in Dragon's favor as to those claims.

**E.      AIG Cannot Establish Causation**

41.      AIG has no evidence that a defect in the Engine or the Unit caused the fire in question.  AIG's design defect and manufacturing defect claims both require AIG to prove that the alleged defect in the Engine, that it "threw a rod," was the producing cause of AIG's alleged damages. *Timpte Indus., Inc.*, 286 S.W.3d at 311; *see also Ford Motor Co.*, 135 S.W.3d at 600.

42.      In *Mack Trucks*, the Court held that to survive summary judgment on the plaintiffs' theory that a defect in a tractor's fuel system was the cause of a fire, the plaintiffs were required to present more than evidence of a fuel leak. *See Mack Trucks*, 206 S.W.3d at 582 (citing *Ford Motor Co.*, 135 S.W.3d at 600–01). Essentially, the plaintiffs had to present evidence that (1) the diesel fuel leaked because of one or more of the alleged defects, and (2) the leak caused by the defect was the ignition point for the fire. *See id.* Despite pointing to several potential defects, the Court ultimately held that the plaintiffs had not proved causation because they failed to provide any evidence that "any of the possible sources of diesel fuel was more likely than any other . . . to have been the source of liquids that first caught fire." *See id.* at 583.

43.      The *Mack Trucks* holding is consistent with the court's opinion in *Nissan Motor Company Ltd. v. Armstrong* and *Ford Motor Co. v. Ridgway*. In each of these cases, the Texas Supreme Court held that the plaintiff had failed to rule out other potential causes of the accidents, and therefore the plaintiffs had no evidence that the alleged defect caused the plaintiff's injury. *Nissan Motor Co.*, 145 S.W.3d at 137–38; *Ford Motor Co.*, 135 S.W.3d at 600–02. In *Nissan*, the Court held that a plaintiff must not only identify a specific defect, which AIG has not done in this case, but "other possible causes must be ruled out." *See Nissan Motor Co.*, 145 S.W.3d at 137. The

24

Court further held that this requirement that other possible cause be ruled out is particularly compelling in cases in which there are numerous potential causes. *See id.*

44.     In this case, not only has AIG failed to produce any evidence of a defect in the Engine or the Unit, but it has completely failed to rule out other potential causes of the fire.  Dragon's expert Scott Davis and Caterpillar's expert Gregory Haussmann have both concluded that there are numerous ways that the fire could have begun, many more likely than a connecting rod exiting the crankcase and starting the fire. Ex. T at pp. 21-24; Ex. U at pp. 11-16.   Finally, it is quite apparent from the reports produced by AIG that none of its experts considered alternative causes for the fire. *Id.*; Ex. U at 11-16.

45.     Essentially, AIG has attempted to argue that just because a fire occurred and a connecting rod was thrown, the connecting rod must have been defective and caused the fire. However, this theory does not constitute sufficient proof of a product defect or of causation as AIG has completely failed to rule out other potential causes of the fire. *See Mack Trucks*, 206 S.W.3d at 583–84; *Nissan Motor Co.*, 145 S.W.3d at 137–38. Because AIG has failed to rule out other potential causes of the fire and has provided no direct evidence of a defect or evidence that such defect caused the fire, AIG's products liability claims must fail. *See Mack Trucks*, 206 S.W.3d at 583–84; *Nissan Motor Co.*, 145 S.W.3d at 137–38.

46.     "Texas law does not generally recognize a product failure standing alone as proof of a product defect." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 807 (Tex.2006); *Omni USA, Inc.*, 964 F. Supp. 2d 805, 837 (S.D. Tex. 2013). Throughout this Motion, Dragon has established that AIG has adduced no evidence establishing that any product was defective nor that any defect was present at the time it left the manufacturer.  Specifically, none of AIG's experts have

opined that the Engine was de777fective at the time it left the manufacturer's possession, or at any time thereafter, and no expert has opined that a defect in the Engine caused the fire.

**F.      AIG Has Not Established Proper Use to Support an Implied Warranty Claim**

47.      A plaintiff may show a defect in an implied warranty of merchantability case by means of circumstantial evidence by establishing that there was a malfunction together with evidence of proper use of the goods. *Plas–Tex*, 772 S.W.2d at 444–45; *see also Omni USA, Inc.*, 964 F. Supp. 2d 805, 837 (S.D. Tex. 2013). In *Omni*, a plaintiff claimed that the defendant breached the implied warranty of merchantability because a defect existed in "Parker seals" that caused a leak. 964 F. Supp. 2d at 837. Despite evidence of a malfunction with the seals, the court granted summary judgment against the plaintiff because it failed to present evidence of its use of the seals, proper or improper. *Id.* Without evidence of its proper use of the seals, the plaintiff could not maintain its claim for breach of the implied warranty of merchantability. *Id.*

48.      In this case, AIG has brought forward no evidence of proper use of the Unit and Engine by Baker Hughes. The evidence that has been produced demonstrates that Baker Hughes did not properly use or maintain the Unit and Engine. For instance, Baker Hughes's own standards required that Units be spaced three to four feet apart at a well site, yet at the St. Lucia well site, the units were only spaced two to three feet apart. Ex. A at 79:1-80:7.  Further, the evidence indicates that to properly maintain the Engine and Unit, Baker Hughes should have performed an oil change every 250 hours, yet the evidence produced by AIG demonstrates that Baker Hughes performed only one oil change in at least 800 hours of use. Ex. C at 113:17-114:12; 126:20-126:23; 131:6-132:1; Ex. D at unnumbered p. 21-22; Ex. F; Ex. U at 14.

49.      In addition, the evidence produced by Caterpillar demonstrates that it is likely Baker Hughes performed only one oil change during over 1900 hours of use of the Engine. Ex. D at

unnumbered p. 21-22; Ex. U at 14.  Thus, there is not only a complete lack of evidence of proper use of the Engine by Baker Hughes, but there is evidence of improper use of the Engine by Baker Hughes because of improper spacing and maintenance.  Accordingly, AIG has failed to produce sufficient evidence to demonstrate proper use of the Engine, and therefore AIG cannot establish by circumstantial evidence alone that a defect existed in the Engine at the time it left Dragon's possession. *See Omni USA, Inc.*, 964 F. Supp. 2d at 837. Thus, AIG has no direct evidence of a defect and cannot rely on circumstantial evidence of failure alone to prove its implied warranty claim. As a result, Dragon is entitled to summary judgment as to AIG's claim based on a breach of the implied warranty of merchantability. *See Omni USA, Inc.*, 964 F. Supp. 2d at 837.

## G.      Dragon Neither Provided nor Breached an Express Warranty

50.     In order to recover for the breach of an express warranty, AIG must prove: (1) an express affirmation of fact or promise by the Dragon relating to the goods; (2) that such affirmation of fact or promise became a part of the basis of the bargain; (3) that AIG relied upon said affirmation of fact or promise; (4) that the goods failed to comply with the affirmations of fact or promise; (5) that the plaintiff was injured by such failure of the product to comply with the express warranty; and (6) that such failure was the proximate cause of plaintiff's injury. *See Great Am. Products v. Permabond Intern., a Div. of Nat'l Starch & Chem. Co.*, 94 S.W.3d 675, 681 (Tex. App.—Austin 2002, pet. denied).

51.     Dragon provides no warranties separate and apart any warranty provided by a product manufacturer.  Ex. Q at 55:24-56:6.  AIG has not, and cannot, produce any evidence demonstrating that Dragon made any express affirmation of fact or promise relating to the goods at issue in this

case[8]; no evidence that an affirmation of fact or promise became the basis of the bargain between

AIG and Dragon; no evidence that the goods at issue failed to comply with an affirmation, fact or

promise made by Dragon; no evidence that AIG was injured by Dragon's failure to comply with an

express warranty; and no evidence of proximate cause. Accordingly, Dragon is entitled to summary

judgment as to AIG's claim for breach of an express warranty. *See Omni USA, Inc..,* 964 F. Supp. 2d

at 843 (granting summary judgment as to plaintiff's claim for breach of express warranty for lack of

evidence).

**H.      There is No Evidence Dragon was Negligent**

52.      To recover for negligence, a plaintiff must establish: (1) the existence of a duty that

the defendant owed to the plaintiff, (2) breach of that duty, and (3) damages proximately caused by

that breach. *See D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002); *Van Horn v. Chambers*,

970 S.W.2d 542, 544 (Tex. 1998). To establish that Dragon breached a duty, AIG must show that

Dragon either did something an ordinarily prudent person exercising ordinary care would not have

done under those circumstances, or that the Dragon failed to do that which an ordinarily prudent

person would have done in the exercise of ordinary care. *See Caldwell v. Curioni*, 125 S.W.3d 784,

793 (Tex. App.—Dallas 2004, pet. denied).

53.      AIG has adduced no evidence demonstrating that Dragon owed a duty to Baker

Hughes or AIG; that Dragon did something an ordinarily prudent person exercising ordinary care

would not have done under the same circumstances; that Dragon failed to do that which an ordinarily

prudent person would have done in the exercise of ordinary care; or that Dragon's alleged breach of

---

[8] Despite multiple properly requested Rule 30(b)(6) deposition notices, AIG never produced a corporate representative with any knowledge of the requested topic of its warranty claims.

its duty caused any injury to AIG. Accordingly, Dragon is entitled to summary judgment in its favor as to AIG's negligence claim.

## I.      There is No Evidence Dragon Breached a Contract or Quasi-Contract

54.      The elements of a breach of contract claim are " '(1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach.'" *McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 27 (Tex. App.–San Antonio 2004, no pet.) (quoting *Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 898 (Tex. App.–San Antonio 2002, no pet.)).

55.      To the extent that Plaintiff's defective and extremely cursory pleadings on breach of contract satisfy this Court's standards, AIG has adduced no evidence of any contract that Dragon breached; and no evidence that Plaintiff was damaged as a result of a breach of contract by Dragon. Accordingly, Dragon is entitled to summary judgment as to AIG's breach of contract claim against it. *Bensono v. Indymac Mortg. Services*, 02-13-00197-CV, 2014 WL 787851, at *2 (Tex. App.—Fort Worth Feb. 27, 2014, no pet.).

56.      Finally, AIG also has no evidence of quasi-contract. "'Contracts implied in law, or . . . more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice . . . .'" *Ferrous Prod. Co. v. Gulf States Trading Co.*, 332 S.W.2d 310, 312 (1960) (quoting Arthur L. Corbin, Corbin on Contracts and C.J.S., Contracts ). "'Such contracts rest on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever it is certain that a man ought to do, that the law supposes him to have promised to do . . . .'" *Id.*; *see also Plotkin v. Joekel*, 304 S.W.3d 455, 478 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Restitution is an appropriate remedy for breach

of an implied, or quasi-contract where an agreement contemplated between parties is "unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons." *City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 319 (Tex. App.— Austin 1992, no writ).

57.     In this case, AIG has adduced no evidence or alleged any facts supporting a claim based on quasi-contract.  AIG has adduced no evidence that Dragon has been unjustly enriched at the expense of AIG. *See Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp. 2d 623, 640 (S.D. Tex. 2007). Accordingly, Dragon is entitled to summary judgment as to AIG's claim based on quasi-contract theories. *See Plotkin*, 304 S.W.3d at 478.

## CONCLUSION

58.     Plaintiff has squarely blamed the Caterpillar engine for the fire and property damage it seeks in this case.  Dragon did not design or manufacture the engine or any other product upon which Plaintiff places blame.  Plaintiff has not demonstrated any defect in the Caterpillar engine or any other product.  Further, pursuant to Chapter 82 of the Texas Civil Practices and Remedies Code, Dragon, as a non-manufacturing seller, is immune from each of Plaintiff's claims, including its breach of implied warranty of merchantability claim.  Plaintiff has neither properly plead or adduced evidence of a contractual, quasi-contract, or express warranty claim against Dragon.

## PRAYER

For these reasons, Defendant, Dragon Products, LLC, respectfully requests this Court grant its motion for summary judgment on all of Plaintiff's claims, dismiss Plaintiff's claims with prejudice, and grant Defendant all other and further relief to which this Court finds it to be entitled.

Respectfully submitted,

 /s/ David C. Deiss
DAVID A. OUBRE
David.Oubre@lewisbrisbois.com
Federal I.D. No. 23909
State Bar No. 00784704
DAVID C. DEISS
David.Deiss@lewisbrisbois.com
Federal I.D. No. 33627
State Bar No. 24036460

LEWIS BRISBOIS BISGAARD & SMITH, LLP
24 Greenway Plaza, Suite 1400
Houston, Texas  77046
(713) 659-6767 Telephone
(713) 759-6830  Facsimile

**ATTORNEYS  FOR  DEFENDANT
DRAGON PRODUCTS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, do hereby certify that I forwarded a true and correct copy of the foregoing instrument to all counsel of record through the Court's ECF system on this the 13th day of May, 2019.

 /s/ David C. Deiss
David C. Deiss